IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 3:00-cr-00626-CMC |
| | ) | |
| BRIAN PETER ZATER | ) | |

**United States' Response in Opposition to
Defendant's Motion for Compassionate Release**

Defendant Brian Peter Zater seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) based on the length of the mandatory sentences he received for two violations of 18 U.S.C. § 924(c) in relation to the terms that would be applied under current law. As set forth below, the motion should be denied.

## I.     BACKGROUND

In the summer of 2000, Defendant Brian Peter Zater and his co-defendants Ryan Zater, Ryan Graves, and Joshua Darley came up with an elaborate plan to violently rob banks in another state. They traveled from Florida to North Carolina and initially planned to rob a bank there. However, after casing the North Carolina bank, they decided not rob it because it had limited access to highways and was close to a police station. They then decided to rob the Carolina Southern Bank in Spartanburg, South Carolina. That bank robbery was quickly followed by a second bank robbery in West Columbia, South Carolina, which was described by the United States Probation Office as "one of the most dangerous and violent bank robberies in South Carolina's history." *See* Presentence Investigation Report ("PSR"), ¶s 5-6, 28.

During the planning stages, the robbery crew rallied to fund the purchase of equipment necessary to pull off the armed bank robberies. For example, Ryan Zater offered to finance the operation through his illegal drug sales of "ecstasy" and marijuana. They purchased bullet proof

vests, a lock picking kit and book, a police scanner and police code book, a digital timer, 2 Motorola walkie talkies, Army surplus black jackets, t-shirts, ski masks, pants, and boots. Since they were unable to buy the firearms themselves because Brian Zater had a felony conviction, Ryan Zater had an outstanding warrant, and Ryan Graves was underage, they recruited another person, a straw purchaser, to buy three firearms for them. The Keltec .40 caliber handgun, Keltec 9mm handgun, and Mossburg 12-gauge shotgun with pistol grip for easy concealment, along with ammunition, shotgun plugs, and birdshot were purchased in Jacksonville, Florida, with money from Ryan Zater's illegal drug sales. They chose the birdshot as it had the most number of pellets and would spray a wide pattern and chose the shotgun slug because it would shoot through a police car door if needed. The shotgun would be set up to have two shotgun shells with birdshot, followed by a slug. *See* PSR, ¶s 7-9.

The robbery crew put a lot of planning into the bank robbery, deciding to rob a bank near the interstate for a fast getaway, using a timer to make sure they were out of the bank in 90 seconds, wearing bulletproof vests in case they were in shootouts with law enforcement, using masks and gloves to hide their identities, and using stolen cars with stolen license tags as getaway cars. It was determined that Ryan Graves would hold the shotgun to control the bank employees and customers, while Brian Zater and Ryan Zater would each have a handgun and jump the teller counter to get to the vault. Joshua Darley's role was to be the getaway driver. They later bragged to law enforcement that they modeled the robberies after the movies "Point Break" and "Heat," which they watched to further their techniques. PSR, ¶s 7-8, 10.

Thereafter, they traveled to South Carolina on June 25, 2000, to case the Carolina Southern Bank. That night they checked out their weapons, wiped them of their fingerprints, and then only handled them from that point on with gloves. On June 26, 2000, the crew stole a car to use as a

getaway car and put another stolen license tag on it in an effort to further evade law enforcement. They then drove to the bank where Brian Zater, Ryan Zater, and Ryan Graves entered the bank brandishing the shotgun and handguns and yelling profanities. The tellers were ordered into the lobby and onto the floor and warned not to push any alarms or they would be killed. They also told the tellers to not include any fake bills or dye packs when putting the money in the bag. Ryan Graves yelled out how much time they had remaining, as they agreed to only stay inside the bank for less than 2 minutes. Graves also maintained contact via a walkie talkie with Darley, who was outside in the getaway car with a handgun in his lap. Time ran out before they could get the money from the vault, so they left with the approximately $36,711 from the teller drawers. After the robbery, they all returned to Florida where they split the proceeds four ways. PSR, ¶s 11-14.

The robbery crew, along with James Benson, returned to South Carolina on July 16, 2000, with plans to rob the South Trust Bank in Lexington. However, after beginning preparations for the robbery, the group decided that the BB&T Bank would be a better bank to rob as it provided a better getaway route and the area was less congested. They were going to rob it that day; however, time ran out and the crew decided that things were happening too fast and they needed additional time to plan. So, they abandoned the getaway car that they had stolen and returned to Florida. PSR, ¶s 15-16.

Several days later, on July 23, 2000, the crew, this time joined by co-defendant James Benson, decided to return to South Carolina to rob the BB&T Bank in West Columbia. They rented a vehicle in Florida and also drove their own vehicle to South Carolina. After arriving in West Columbia, the crew stole another car to use as a getaway car and also stole a license tag from yet another car to put on the stolen getaway car, to further hamper any law enforcement investigation. PSR, ¶ 17.

On the morning of July 24, 2020, co-defendants James Benson and Joshua Darley scouted out the interior of the bank to find out if any security guards were on duty. Once they determined that there were no security guards inside, Benson and Darley reported back to the other members of the robbery crew and positioned themselves down the highway on either side of the bank in order to watch for law enforcement. Their job was use their walkie talkies to notify co-defendants Brian Zater, Ryan Zater, and Graves if they spotted any officers approach during the bank robbery. PSR, ¶ 18.

During the West Columbia bank robbery, Brian Zater, Ryan Zater, and Graves brandished handguns and a shotgun, jumped the counter while yelling profanities at the employees and customers, forced bank employees and customers down onto the floor at gunpoint, and counted off 90 seconds to make sure they were out of the bank before police arrived. They wore ski masks to conceal their identities, wore gloves to conceal their fingerprints, ordered the tellers to not push any alarms, gained access to the vault, and ran out of the bank with over $110,000. As they were leaving the bank, one of the dye packs exploded and began to emit tear gas, so they threw the money from the car. PSR, ¶s 19-21.

An officer with the West Columbia Police Department was on regular patrol just down the street when dispatch sent out the call about the armed bank robbery and a possible white getaway car. The officer quickly responded and noticed a suspicious white car with three males on the street near the bank, so he activated his blue lights in an attempt to conduct a traffic stop. The suspicious car started to stop, then as the officer exited his patrol car, Ryan Zater put the car in reverse and made a 180-degree turn, narrowly missing another car, and sped off. The officer jumped back into his patrol car and a high speed chase through the residential neighborhood behind the bank ensued. At one point in the chase, Ryan Zater abruptly stopped the car and Brian Zater jumped out and

fired three rounds at the officer before speeding away again. The three defendants in the getaway car ultimately crashed into another unmarked patrol car driven by Detective Kevin Riley. PSR, ¶s 21-24.

A shootout then ensued in the residential neighborhood. Brian Zater and Ryan Graves both shot at the officers while using the door jam of their vehicle as protective covers, striking one officer, and narrowly missing a child in a nearby home[1]. Ryan Zater jumped from the car and ran away. Then, Brian Zater grabbed Ryan Zater's handgun and fired additional rounds towards officers. Ryan Graves also fled while firing his shotgun and was struck in the leg by officers returning fire. Graves fled, applied a tourniquet and with Ryan Zater managed to cross the river. However, Graves and Ryan Zater were apprehended that same day[2] after Special Agent Rob Waizenhofer (FBI) observed them after a SLED helicopter searching the area blew away the pine straw they had covering their bodies as they lay on the ground. PSR, ¶s 21-24.

Ryan Graves immediately cooperated with the FBI and told them that the crew came from Florida to specifically rob another South Carolina bank as they had previously robbed a bank in Spartanburg. Investigators were then able to connect the crew to the unsolved June 26, 2000, Spartanburg armed bank robbery. Graves also advised that two others were involved in the elaborate plan, Benson and Darley. Prior to Graves' cooperation, investigators were unaware of their involvement as they were outside the bank and had immediately fled back to Florida after the robbery.

---

[1] One of the bullets struck a door jam inside the residence where the child was present. PSR, ¶ 28.

[2] All three defendants were arrested on state charges on July 24, 2000, and ultimately plead guilty to both state and federal charges arising from the incidents.

Brian Zater continued to allude law enforcement for several days by hiding in a ravine and then underneath a residence in the neighborhood behind the bank. He tried to break into a residence with his firearm, but was unable to gain access. Four days after the armed bank robbery, on July 28, 2000, Brian Zater broke into a residence and surprised Dr. Woodbury and his girlfriend, Ms. Taylor, as they returned home that evening. At gunpoint, Brian Zater demanded that the two drive him to Savannah, Georgia. Dr. Woodbury offered his car keys to Brian Zater and told him that his car was full of gas and to just take it and let them stay. Brian Zater pointed the gun at their heads and told them if they didn't move, he was going to shoot them. PSR, ¶s 25-27.

Once in the car, Dr. Woodbury continued to try and reason with Brian Zater to let them go and just take the car and he refused and said they were coming with him. Due to the extensive manhunt in the area, news media were broadcasting nightly from the area. As they drove past one of the news trucks, Dr. Woodbury signaled to his girlfriend to unbuckle her seatbelt while he did the same and activated the door unlock button, which caused Zater threaten to kill him if he stopped the car. While Zater was still fixated upon the news truck, Dr. Woodberry was able to jump through the center section of the front seat of the car and pin Brian Zater's gun and arm against the backseat. While the struggle ensued between Brian Zater and Dr. Woodbury in the backseat, Ms. Taylor jumped from the front seat of the car sustaining permanent injuries. Dr. Woodbury and Brian Zater continued to struggle until the car struck something and stopped. Then, Brian Zater jumped from the car, leaving behind his handgun. Dr. Woodbury pursued Zater with his vehicle, managing to strike him with the car; however, Zater continued to flee. Dr. Woodbury also used Zater's gun to fire two shots at him to try and get him to stop. He chased Zater on foot through a McDonald's and back out again, where they struggled again with Zater striking Dr. Woodbury above his eye. Brian Zater managed to escape from Dr. Woodbury, but law enforcement responded quickly and

found him hiding underneath an old railroad caboose in the McDonald's parking lot. PSR, ¶s 25-27.

Defendant Brian Zater and two of his co-conspirators, Ryan Zater and Ryan Graves, were each charged in federal complaints on July 25, 2000. ECF #s 1, 2, 3. A few days later, two additional co-conspirators, James Benson and Joshua Darley, were charged in federal complaints. ECF #s 4, 5. Thereafter, a federal grand jury returned an indictment on August 18, 2000. ECF # 14. Subsequently, the grand jury returned a nine-count superseding indictment on September 20, 2000, charging all five defendants with conspiracy, armed bank robbery (two separate counts), and firearms offenses. Zater was charged in eight counts, alleging violations of 18 U.S.C. §§ 2, 371, 922(g), 924(a), 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 924(o), 2113(a), 2113(d), and 2113(e). ECF # 49.

Pursuant to a written plea agreement, Brian Zater pled guilty on November 9, 2000, to: count 1 - conspiracy to commit armed bank robberies, in violation of 18 U.S.C. § 371; count 2 – armed bank robbery, in violation of 18 U.S.C. §§ 2113(a), 2113(d), and 2; count 3 - using, carrying and brandishing a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii); count 5 – armed bank robbery and hostage taking, in violation of 18 U.S.C. §§ 2113(a), 2113(d), 2113(e), and 2; and count 6 - brandishing and discharging a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii). ECF #s 62, 63.

A PSR was completed which outlined Brian Zater's guidelines as: a base offense level 20 on the Spartanburg bank robbery with a 2-level enhancement since it involved a financial institution and 1-level enhancement due to the amount of loss, which resulted in an adjusted base offense level 23; and a base offense level 20 on the West Columbia bank robbery with a 2-level enhancement since it involved a financial institution, a 4-level enhancement due to victims

sustaining serious bodily injury, a 4-level enhancement for two persons being kidnapped to facilitate his escape, a 2-level enhancement for carjacking, a 2-level enhancement due to the amount of loss, a 3-level enhancement for assaulting a police officer during flight, and a 2-level enhancement for reckless endangerment during flight, which resulted in an adjusted base offense level 39. He received a 3-level reduction for acceptance of responsibility, which took him to a total offense level 36. His criminal history category was II based upon 2 criminal history points, which resulted in a guidelines range of 210 to 262 months. However, he also faced a *consecutive* 84 months and *consecutive* 300 months on the two § 924(c) charges. PSR, ¶s 42-70, 84-85, 87.

The Honorable Dennis W. Shedd, United States District Judge, conducted Brian Zater's sentencing hearing on March 28, 2001. ECF #s 79, 86. Zater was sentenced to a total of 594 months imprisonment, consisting of 60 months on count 1, 210 months as to counts 2 and 5, 84 months as to count 3, and 300 months as to count 6. The district court ordered that counts 1, 2, and 5 would run concurrently with each other, while counts 3 and 6 would run *consecutively* with all other counts, including each other. Zater was also sentenced to 5 years of supervised release following the term of imprisonment and ordered to pay $37,452.27 in restitution jointly and severally with his co-defendants[3]. ECF # 86.

Brian Zater filed a notice of appeal on June 18, 2001, almost three months after sentencing. The Fourth Circuit Court of Appeals granted the Government's motion to dismiss the appeal on

---

[3] Ryan Zater was sentenced to a total of 444 months imprisonment; Ryan Graves was sentenced to a total of 454 months imprisonment; Joshua Darley was sentenced to a total of 238 months imprisonment; and James Benson was sentenced to a total of 210 months imprisonment. ECF #s 86, 87, 93, 99.

February 19, 2002. The Fourth Circuit denied a petition for rehearing on March 29, 2002. ECF #s 108, 109, 122, 127, 128.

On March 19, 2002, Brian Zater filed a motion to vacate, set aside, or correct his sentence pursuant to § 2255. The court dismissed Zater's § 2255 motion in part on September 30, 2002. *See United States v. Zater*, 02–958–HMH (D.S.C. Sept. 30, 2002)(*unpublished*). On December 17, 2002, the district court granted the Government's motion for summary judgment and dismissed Zater's remaining claims in his § 2255 motion. *See United States v. Zater*, 02–958–HMH (D.S.C. Dec. 17, 2002)(*unpublished*). The Fourth Circuit Court of Appeals denied Zater's request for a certificate of appealability on May 20, 2003. *See United States v. Zater*, 63 Fed.Appx. 159, 2003 WL 21153398 (4th Cir. May 20, 2003)(*unpublished*). The United States Supreme Court denied certiorari December 1, 2003. *See Zater v. United States*, 540 U.S. 1065, 124 S.Ct. 846 (Mem)(2003).

Thereafter, on January 11, 2006, Brian Zater filed a second § 2255 motion. The district court thereafter dismissed Zater's § 2255 motion as successive. *See United States v. Zater*, 3:06-156-HMH, 2006 WL 162586 (D.S.C. Jan. 20, 2006). Zater sought to appeal and the district court denied the certificate of appealability. *See D.S.C. 3:06-cv--156-HMH, ECF # 7*. Zater appealed to the Fourth Circuit, which dismissed the appeal for failure to prosecute pursuant to Local Rule 45. *See D.S.C. 3:06-cv--156-HMH, ECF #s 8 and 9; United States v. Zater*, No. 06-6212 (4th Cir. April 12, 2006).

Brian Zater also filed a petition for writ of certiorari to the Eleventh Circuit Court of Appeals, which was denied by the United States Supreme Court. *See Zater v. Pastrana*, 138 S.Ct. 1336 (Mem)(2018).

In May 2018, Brian Zater filed a motion pursuant to Fed. R. Civ. P. 60(b). ECF # 211.

Thereafter, the Court filed an Order granting the Government's motion to dismiss. ECF #s 216, 224. Zater appealed to the Fourth Circuit Court of Appeals. On January 23, 2019, the Fourth Circuit dismissed Zater's appeal and issued their mandate March 28, 2019. ECF #s 228, 235, 236. *See United States v. Zater*, No. 18-7265 (4th Cir. January 23, 2019).

In September 2020, Brian Zater filed the instant compassionate release motion. ECF # 243. This Court issued a text Order holding the motion in abeyance pending the Fourth Circuit's decisions in *United States v. McCoy*, No. 20-6821 (4th Cir. June 5, 2020) or *United States v. Bryant*, No. 20-6869 (4th Cir. June 12, 2020). ECF # 245. Zater filed a supplemental response in October 2020. ECF # 251. The Fourth Circuit issued an opinion in *McCoy on December 2, 2020*, and six days later, this Court issued a text Order directing the Government to file a response within 14 days, making the Government's response due on or before December 22, 2020. ECF # 254.

Defendant Brian Zater is serving a sentence of 594 months imprisonment, including 384 consecutive months resulting from two convictions under 18 U.S.C. § 924(c). However, in Section 403 of the First Step Act, Congress amended § 924(c) to provide that the 25-year consecutive term for a successive § 924(c) offense does not apply unless the defendant had a previous, final conviction for a § 924(c) charge at the time of the offense.[4] Under current law, the Defendant would face a seven-year sentence on the first § 924(c) brandishing charge and a ten-year sentence on the second § 924(c) discharging charge. The statute still requires each such sentence to run

---

[4] See First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5222, § 403. Based on this amendment, § 924(c)(1)(C) now provides: "In the case of a violation of this subsection that occurs after a prior conviction under this subsection has become final, the person shall – (i) be sentenced to a term of imprisonment of not less than 25 years. . . ." The other provisions of § 924(c), including those requiring a seven-year mandatory minimum term for brandishing a firearm in relation to a crime of violence, and directing that each sentence under § 924(c) must run *consecutively* to any other sentence imposed, remain unchanged.

*consecutively* to each other and to any other sentence imposed. That means the mandatory minimum sentence on two § 924(c) counts alone, if charged today in the same initial § 924(c) prosecution, would be 17 years[5] in addition to the sentence on the underlying armed bank robberies.

## II.     ARGUMENT

The Defendant Brian Zater seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), which permits a court to reduce a sentence upon a showing of "extraordinary and compelling" circumstances. It appears that this Court has jurisdiction to consider the request as Brian Zater has exhausted his administrative remedies as he filed a request with the Federal Bureau of Prisons in June 2020[6].

The Defendant asserts his service of a sentence that would not be imposed under current law presents such a circumstance, allowing the Court to reduce his sentence substantially. The Court should deny the Defendant's motion with prejudice because the changes to the § 924(c) stacking penalties alone do not entitle the Defendant to relief under § 3582(c)(1)(A)(i).

### A.  The Court Should Deny the Motion with Prejudice.

#### 1.  The Fourth Circuit's decision in *United States v. McCoy* does not entitle the Defendant to relief from stacked sentences as a matter of right.

In *United States v. McCoy*, --- F.3d ----, 2020 WL 7050097 (4th Cir. Dec. 2, 2020), the Fourth Circuit held the policy statement found in U.S.S.G. § 1B1.13—which applies to reductions

---

[5] That does not include the sentences imposed for the underlying armed bank robberies.

[6] See Zater's Exhibits to his Motion. ECF # 243-1, pp. 4-8. The undersigned consulted Federal Bureau of Prisons Supervisory Legal Counsel Lara Crane, who advised that it does not appear that the request has been ruled upon yet.

in terms of imprisonment under § 3852(c)(1)(A)—does not apply to compassionate release motions *brought by inmates* under § 3582(c)(1)(A)(i). [7] *Id*. at \*6–9. In place of the policy statement, *McCoy* permits "courts [to] make their own independent determinations of what constitutes an 'extraordinary and compelling reason[ ]' under § 3582(c)(1)(A), as consistent with the statutory language[.]" *Id*. at \*9.

*McCoy* noted, however, that § 1B1.13 "remains helpful guidance even when motions are filed by defendants." *Id*. at \*7 n.7. It approvingly cited the Seventh Circuit's recent decision in *United States v. Gunn*, --- F.3d ----, 2020 WL 6813995, at \*2 (7th Cir. Nov. 20, 2020), which similarly held there is currently no applicable policy statement for compassionate release motions brought by inmates. The Seventh Circuit explained § 1B1.13 remains useful in framing a court's inquiry as to what constitutes "extraordinary and compelling reasons." As it stated:

> The statute itself sets the standard: only 'extraordinary and compelling reasons' justify the release of a prisoner who is outside the scope of § 3582(c)(1)(A)(ii). The substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of 'extraordinary and compelling reasons'; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused. In this way the Commission's analysis can guide discretion without being conclusive.

*Id*. (citing *Gall v. United States*, 552 U.S. 38, 49–50 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007)). Thus, although *McCoy* broadened courts' discretion under § 3582(c)(1)(A), it

---

[7] The mandate in *McCoy* has not yet issued. Any petition for rehearing or rehearing en banc in the Fourth Circuit is due January 15, 2020. *United States v. McCoy*, No. 20-6821, ECF No. 75 (4th Cir. Dec. 14, 2020). The Fourth Circuit's judgment in *McCoy* is not final until the mandate issues; "at that time the parties' obligations become fixed." Fed. R. App. P. 41, advisory committee notes to 1998 Amendments; *see also Alphin v. Henson*, 552 F.2d 1033, 1035 (4th Cir. 1977) ("Our control over a judgment of court continues until our mandate has issued . . . ."); *Charpentier v. Ortco Contractors*, 480 F.3d 710, 713 (5th Cir. 2007) ("This court retains control over an appeal until we issue a mandate. Before our mandate issues, we have the power to alter or modify our judgment. Accordingly, our decision is not final until we issue a mandate.").

nonetheless appeared to envision a system whereby courts continue to be guided by the existing policy statement.

*McCoy* also held that in considering whether extraordinary and compelling reasons exist for a sentence reduction, district courts are permitted to consider the "unusual length" of a sentence as well as the "'gross disparity' between those sentences and the sentences Congress now believes to be an appropriate penalty for the defendants' conduct." 2020 WL 7050097, at \*10. It thus concluded Congress' recent amendments to the stacking provisions of § 924(c) could, when coupled with other defendant-specific factors, constitute extraordinary and compelling reasons under § 3582(c)(1)(A)(i). *Id*.

*McCoy* did not hold, however, that the existence of stacked § 924(c) sentences alone *necessarily* satisfies the requirements of § 3582(c)(1)(A)(i) in all cases. Instead, it held courts "may consider" that "defendants are serving sentences that Congress itself views as dramatically longer than necessary or fair." *Id*.; *see also United States v. Gadson*, No. 5:00-cr-917-CMC, ECF No. 76 at 4–5 (D.S.C. April 30, 2020) (holding, before *McCoy* was issued, that although "the stacking of multiple § 924(c) sentences can be *a factor* in reducing a sentence under s 3582(c)(1)(A)(i)," "Congress did not intend the sentencing disparity between defendants sentenced before and after the § 924(c) amendment to constitute a sufficient basis *on its own* to grant a reduction in sentence" (emphasis added)). *McCoy* stressed the "extraordinary and compelling" prong of § 3582(c)(1)(A)(i) is a "heightened standard," and only those defendants who can meet that standard may obtain relief. 2020 WL 7050097, at \*11. As the court explained, "it was not unreasonable for Congress to decide that it did not want sentence reductions based on § 403 of the First Step Act to be as widely available as relief under § 404 – and thus to limit those reductions to *truly* extraordinary and compelling cases." *Id*. (emphasis added).

In its broadest terms, *McCoy* thus holds that although § 1B1.13 is not the applicable policy statement for compassionate release motions brought by inmates, defendants still must meet the "heightened standard" required by § 3582(c)(1)(A)(i). Both before and after *McCoy*, defendants must clear the "extraordinary and compelling" threshold by presenting circumstances "[b]eyond what is usual, customary, regular, or common," Extraordinary, *Black's Law Dictionary* (11th ed. 2019), that "go[] beyond what is usual, regular, or customary," or that are "exceptional to a very marked extent." "Extraordinary." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/extraordinary. Accessed 3 Dec. 2020. If the mere presence of previously mandated stacked § 924(c) sentences was sufficient to constitute an extraordinary and compelling reason, § 3582(c)(1)(A)(i)'s use of the phrase "extraordinary and compelling" would be rendered meaningless.

In *McCoy*, the Fourth Circuit stated a district court must make an individualized inquiry in each case, and it noted the district courts at issue relied upon individual circumstances of the appellants, including their "relative youth – from 19 to 24 years old – at the time of their offense . . . combined with the substantial sentences the defendants already had served." 2020 WL 7050097, at *11. It further noted each appellant had established "excellent institutional records and taken substantial steps toward rehabilitation." *Id*. In affirming the grant of compassionate release for the four appellants, the court highlighted each of the four were relatively young at the time of offense, and each had either no criminal history, a minor criminal history that lacked any prior incarceration, or no relevant criminal history.

While the Defendant in this case was young at the time of the offense and has, by all accounts, has a good record within the Federal Bureau of Prisons[8], he does not meet the heightened standard required by § 3582(c)(1)(A)(i), nor do the underlying facts of his crimes support granting his request for compassionate release. It would create a disparity between sentences imposed in similarly situated cases and also within this instant case. Specifically, Brian Zater's two co-defendants, James Benson and Joshua Darley, neither of which held employees at gunpoint during the armed bank robberies, had prior convictions, or were involved in a shootout with law enforcement officers, received sentences equivalent to the reduced sentence that Brian Zater, one of the ringleaders and arguably one of the most violent of the group, now seeks.

Brian Zater's sentence for the two armed bank robberies is in line with the sentences handed down to his similarly situated co-defendants who participated in what has been described as "one of the most dangerous and violent bank robberies in South Carolina's history." PSR, ¶ 28. It's important to note that these armed bank robberies were not spur of the moment bad decisions, but were well-thought out, meticulously planned bank robberies initially conceived by Zater and his brother. Brian Zater even used his share of the proceeds from the first robbery to purchase stocks, which shows his level of intelligence. PSR, ¶ 83.

The crew prepared for the robberies by watching movies like "Point Break" and "Heat" in an effort to learn more about robbing banks and which techniques would work to evade capture. They knew that violence was likely to result and prepared for that by wearing bulletproof vests and loading the shotgun with both birdshot, which would spray a wider area, and a slug, which

---

[8] *See* Exhibit A (Brian Zater Sentry Report).

would penetrate a patrol car if necessary. Zater and his co-defendants also obtained walkie-talkies to communicate with their lookouts, obtained a police scanner and list of police 10-codes, and kept their time inside the banks down to 90 seconds through the use of a timer. The crew also stole getaway cars and replaced the tags on those cars with stolen license tags in a further effort to evade law enforcement. In fleeing from the second bank robbery, Ryan Zater stopped their getaway vehicle and Brian Zater jumped out of the car and fired rounds at the officer pursuing them. They then fled again, only stopping when they wrecked their car into a law enforcement officer's car. Brian Zater and his co-defendant Ryan Graves began shooting at the officers again, striking one of them. After Ryan Zater fled from the area, Brian Zater picked up his handgun and continued shooting at officers.

Brian Zater was able to escape the scene of the shootout, but held the entire residential neighborhood hostage for almost a week, by hiding out in the area. He attempted to break into one residence, but was unsuccessful. He hid in the crawlspace of another until he was able to break into that residence on July 28, 2000 and startled the residents when they returned. At gunpoint, he demanded they drive him to Savannah, Georgia. He refused their request that he take their car and leave them behind and threatened to kill them if they did not comply. Due to the quick thinking and heroic efforts of the male homeowner, Dr. Woodbury, they were able to get away from Zater by struggling with him and jumping from the vehicle. Both Dr. Woodbury and his girlfriend were injured as a result. PSR, ¶s 25-27.

At sentencing, the Court found the sentence it imposed to be appropriate in light of the seriousness of the offenses, Zater's role in the two armed bank robberies, the fact that a high speed car chase and shootout ensued with police following the second armed bank robbery, the shooting of a responding police officer, and the need to promote respect for the law and to protect the public.

Brian Zater also remained on the loose for a week following the second robbery and capture of his co-defendants and was only arrested following his carjacking and hostage taking of two homeowners at gunpoint. Brian Zater, through his actions, terrorized not only the employees of those banks and the law enforcement officers involved in the car chase and shootout, but the residents of the neighborhood where he hid out for almost a week.

The impact upon the victims, as well as law enforcement, as a result of Zater's elaborate armed bank robbery plan was substantial and long-lasting. The victim impact statements, which are included in the PSR, capture the terror experienced during these robberies. Below are examples:

- Teller 1: "this was a most terrifying experience. On the morning our bank was robbed, I went to work expecting just your typical day at the bank. Those boys burst through the door so loudly, it sounded like something exploded….All you could see was black figures pointing guns. The way they were dressed was frightening in itself. All you could see was black head to toe. The worst thing was the loud obscenity they keep shouting. No one should have to listen to such language, especially with a gun pointed to your back….Lying on a floor, praying for your life, just so something can seek a thrill is an injustice."

- Teller 2: "I have been a bank teller for 15 years total….Since the robbery, I am very jumpy. I work the drive-thru and every time I hear the door open, I just look to see if I recognize the customer. I am very uneasy until I see what they are doing….The robbery was very violent, and although I am not suffering any major medical or mental conditions, my life was changed forever that day."

- Teller 3: "I have nightmares. I wake up crying at night because I had a dream about that day. My daughter does not want me to work in a bank. I am afraid to come to work and relax. I am always looking over my shoulder, no matter where I am. I am always wondering when I enter a public place will I be in the wrong place at the wrong time. I am a more nervous person now, and I worry a lot since this has happened. I must admit I am truly not the same since the incident….these boys took a big part of myself away from me and my family….the images of what they did will not leave my thoughts."

- Teller 4: "During the robbery, I was pushed from behind out of an officer with a gun at my back and stood in the middle of everything that was happening. One of the men stood a few feet in front of myself and the representative I was

seeing, with a gun pointed at us….Being in a bank robbery is truly a dreadful experience and gives first hand evidence to the kind of work that we live in."

- Teller 5: "I feel a lot of anxiety now, very nervous, jumpy feelings. I am very suspicious of everyone. I do not feel safe when I am out in public. I do not feel safe at home. I have nightmares and I have cried a lot and went into depression. This has also affected my life at home and has affected my marriage."

- Hostage 1 (homeowner): "I believe he would have taken us on the Interstate towards Savannah, Georgia, and would have stopped in a desolated spot, walked us into the woods, and shot us execution style in the head. He had already shot police officers and he did not want us to testify against him. This has been a terrible psychological event, but I will recover. However, I will never be the same."

- Hostage 2: "I still have road burns on my right arm and knees. I will need plastic surgery on my ankle and forearm. Our lives will never be the same. Psychologically, our mental state will never feel secure again. Ever (*sic*) time I walk into the house at night I get flashbacks. I am afraid to go upstairs. If I go upstairs, I have to talk myself into it. I have to tell myself it will be okay. This has been a devastating psychological event."

- Police Officer: "These are truly dangerous people and I believe it was their intent to kill me. During the chase, Ryan Zater did a jay turn with his automobile. This is a special maneuver in which you get an automobile to turn 180 degrees to go in the opposite direction of travel. This is taught to all Secret Service Agents who drive the President. This jay turn was executed perfectly by Zater. I believe he had some training. During the shoot out, they got into a prone protective cover, using the door jam of the car. This is too professional not to have been practiced a lot. I believe they are dangerous people and should receive the maximum penalty."

- Detective: "I received at least three (3) pellets in the face. There is no question in my mind that they were shooting to kill. They were wearing bullet proof vests and had already made a decision that they would shoot it out with police. This was their second time and I know they mean to kill us."

PSR, ¶s 30-38. As shown above, the calculated actions of Zater and his co-defendants forever impacted the lives of many innocent people.

This was also not Brian Zater's first time violating the law. Zater, as a juvenile, was adjudicated for petty theft. PSR, ¶ 68. As an adult, he was arrested for six (6) counts of burglary,

grand larceny, carrying a concealed weapon, possession of burglary tools, possession of a weapon, resisting an officer in Jacksonville, Florida. The PSR indicates that he was "stealing stereo equipment and other items out of automobiles." Zater was convicted of 3 of those burglaries and sentenced in 1995 to 9 months confinement with 2 years of community control and 3 years' probation. PSR, ¶ 69. It appears that he was only off probation a couple of years before planning these bank robberies.

His sentence, while substantial, was imposed as a result of the totality of the circumstances surrounding the robbery, namely the theft of getaway cars, the use of bulletproof vests and firearms, threatening to kill the bank employees and customers while forcing them at gunpoint to lay down in the bank lobby, a car chase where Ryan Zater stopped the car so Brian Zater could shot at the pursuing officer, followed by a car wreck and shootout with law enforcement during which an officer was shot and a child was narrowly missed.

These were not run-of-the-mill bank robberies where demand notes were shown or even where firearms were possessed or brandished, but were both extremely calculated and violent. Zater and other members of his robbery crew anticipated and prepared for the violence that could ensue from these robberies, by wearing bulletproof vests and loading the shotgun with both birdshot in order to spray any targets, but also with a slug that could penetrate a patrol car door. These multiple robberies substantially impacted not only the victims inside the banks and the officers involved in the car chase and shootout, but the community members residing in the neighborhood adjacent to the BB&T Bank.

The district court also had evidence of Zater's remorse and conduct in the local detention center before him at the time of sentencing as witnesses wrote letters on Zater's behalf. So, much of what Zater presents was available at the time of sentencing.

**2. Even if the Defendant has presented extraordinary and compelling reasons, the Court, in an exercise of its discretion, should deny compassionate release in light of the statutory sentencing factors.**

As the movant, the Defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See, e.g., United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020). If the Defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *Dillon*, 560 U.S. at 826–27*; see also United States v. Trotman*, --- Fed. App'x ----, 2020 WL 6743609, at *2 (4th Cir. Nov. 17, 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693–94 (5th Cir. 2020). But compassionate release is a "rare" remedy. *Chambliss*, 948 F.3d at 693–94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2–3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

Here, the § 3353(a) factors counsel against granting the "rare" remedy of a reduction in the Defendant's case. As outlined above, Zater's sentence for the armed bank robbery is in line with the sentences handed down to his similarly situated co-defendants who participated in one of the most violent armed bank robberies in South Carolina. At sentencing, the Court found the sentence it imposed to be appropriate in light of the seriousness of the offenses, Zater's role in the two armed bank robberies, the fact that a high speed car chase and shootout ensued with police following the second armed bank robbery, the shooting of a responding police officer, and the need to promote respect for the law, to protect the public, and to reflect the seriousness of the crime.

Zater also remained on the loose for a week following the second robbery and capture of his co-defendants and was only arrested following his carjacking and hostage taking at gunpoint of two homeowners.

As more fully outlined in the proceeding section, this was not Zater's first run in the law, nor was it an impulsive act on his part. The actions of Zater and his co-defendants were calculated, meticulous, well-thought out, and forever impacted the lives of many innocent people.

## III.     CONCLUSION

For these reasons, the Court should deny Defendant Brian Peter Zater's motion for compassionate release.[9]

Respectfully submitted,

PETER M. MCCOY, JR.
UNITED STATES ATTORNEY


BY: s/*Stacey D. Haynes*
Stacey D. Haynes (Fed. ID #5505)
Assistant United States Attorney
1441 Main Street, Suite 500
Columbia, SC 29201
(803) 929-3000 Telephone
(803) 256-0233 Facsimile
Stacey.Haynes@usdoj.gov

December 21, 2020

---

[9] If, however, the Court grants a sentence reduction, it may "impose a term of . . . supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." § 3582(c)(1)(A). In imposing a term of supervised release, the court may impose a period of home confinement as a condition of supervised release, provided that the court finds that home confinement is a "substitute for imprisonment." USSG § 5F1.2; *see* 18 U.S.C. § 3583(d). Alternatively, a court may consider modifying an existing term of supervised release to add a period of home confinement, consistent with USSG § 5F1.2. *See* § 3583(e)(2).

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No.: 3:00-cr-00626-CMC |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| BRIAN PETER ZATER | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I am an employee in the Office of the United States Attorney for the District of South Carolina, Columbia, South Carolina, and as attorney of record, on December 21, 2020, I caused a legal assistant to serve a true and correct copy of **United States' Response in Opposition to Defendant's Motion for Compassionate Release and Exhibit A (Brian Zater Sentry Report)** in the above-captioned case by regular United States Mail, postage paid, on the following person:

> Brian Peter Zater, Reg. # 96904-071
> FCI Miami
> P.O. Box 779800
> Miami, FL 33177

> s/*Stacey D. Haynes*
> Stacey D. Haynes (Fed. ID #5505)
> Assistant United States Attorney
> 1441 Main Street, Suite 500
> Columbia, SC 29201
> (803) 929-3000 Telephone
> (803) 256-0233 Facsimile
> Stacey.Haynes@usdoj.gov